**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HOSSFELD and WES NEWMAN, individually and on behalf of others similarly situated, | ) ) ) | Case No. 1:24-cv-02613 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ALLSTATE INSURANCE COMPANY, | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

1.    Plaintiffs Robert Hossfeld and Wes Newman have each been on the National Do Not Call Registry for more than four years, but despite repeated do-not-call requests, Allstate and/or those on its behalf keep calling their cell phones to advertise and sell Allstate goods and services.

2.    The reasons Plaintiffs continue to receive calls is that Allstate's internal do-not-call ("DNC") practices do not properly track the requirements of the Telephone Consumer Protection Act ("TCPA"), and because Allstate has not properly implemented the policies it has.

3.    For example, the TCPA requires that sellers and those that make calls on their behalf coordinate internal-do not-call lists, in order to effectively stop calls made on their behalf. *In re TCPA*, 20 FCC Rcd. 13664, 13667-68 (2005); *United States v. Dish Network, LLC*, 954 F.3d 970, 976 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 729 (2021).

4.    However, Allstate does not coordinate DNC requests among it, its agents, and their (sub)vendors as required by the TCPA, let alone ensure that those telemarketing on its behalf scrub their call lists against a comprehensive internal DNC list or are properly trained in such compliance.

5.    Additionally, Allstate's do-not-call policy permits calls to phone numbers that are

on an internal DNC list, if the consumer provided prior "express written invitation or consent."

6.      However, the TCPA prohibits making <u>any</u> telemarketing call to a person who has previously asked not to receive such calls; no "express written invitation or consent" exception exists. 47 C.F.R. § 64.1200(d). Moreover, when consent applies in *other* TCPA contexts, the kind of generic leads on which Allstate permits its telemarketers to purchase for "consent" purposes are insufficient. *In re Urth Access, LLC*, 37 FCC Rcd. 14133, ¶ 16 (2022); *Closing the Lead Generator Loophole Order*, 2023 WL 8826682, at \*7-13 (FCC Dec. 18, 2023) (labelling such practices an "abuse").

7.      Plaintiff Hossfeld has sued Allstate for IDNC violations thrice before; this is his fourth suit. Neither of Hossfeld's prior actions caused Allstate to change its policies or practices, and Hossfeld has continued to receive Allstate telemarketing calls.

8.      In Plaintiff Hossfeld's most recent lawsuit against Allstate, the Court entered summary judgment for Plaintiff, *Hossfeld v. Allstate*, No. 20-7091 (N.D.Ill Mar. 28, 2024), holding that Allstate's agents and their telemarketers are "agents" within the meaning of the Restatement (3d) of Agency. The Court also found the conduct to be willful, and that Allstate may therefore be subject to treble damages. *See* 20-7091 Action Dkt. 282.

9.      Although Plaintiff Hossfeld requested such, the summary judgment order did not resolve post-filing telemarketing calls Plaintiff has received, at least one of which came from the same Transfer Kings/Atlantic telemarketing outfit that called him in relation to the 20-7091 Action. Plaintiff Newman, likewise, seeks redress for improper telemarketing violations he incurred on behalf of Allstate.

10.     Because Allstate's TCPA violations are happening on a massive scale, Plaintiffs bring this lawsuit to secure money damages and injunctive relief on behalf of themselves and

others who similarly incurred internal do-not-call violations by or on behalf of Allstate.

**Parties**

11.     Plaintiff Robert Hossfeld is a natural person and a citizen of the State of Texas. At all relevant times, Plaintiff was the subscriber for the personal cellular telephone that received the calls at issue. Plaintiff's cell phone service is on a family plan; it is not associated with a business.

12.     Plaintiff Wes Newman is a natural person who lives in Cook County, Illinois. Plaintiff is the sole subscriber and only regular user for his cell phone that received the calls alleged herein. Plaintiff is a residential subscriber for this phone, which is a non-business number. He received the calls at issue in this District.

13.     Defendant Allstate Insurance Company is a Delaware corporation headquartered in Northbrook, Illinois, in this District. Allstate is a citizen of Illinois.

14.     Allstate is subject to general jurisdiction in the Northern District of Illinois.

**Jurisdiction & Venue**

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

16.     Additionally, the Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs, as each member of the proposed class of at least tens of thousands is entitled to up to $1,500 in statutory damages for each call that has violated the TCPA.  Further, Plaintiffs allege nationwide classes, which will result in at least one class member residing in a state different from Defendant.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant Allstate

3

is a resident of this District, because Plaintiff Newman received the calls at issue while in this District, and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. For example, Allstate's employee in charge of IDNC compliance, Valerie Lim, oversees such from within this District.

## TCPA Background

18.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy[,]" and found that federal legislation was needed because "'telemarketers [could] evade [state-law] prohibitions through interstate operations.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (citations omitted).

19.     Relevant here, the TCPA prohibits initiating any telemarketing call unless the person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. 47 C.F.R. § 64.1200(d). This includes, inter alia, having a written policy, available upon demand, for maintaining a do-not-call list, training personnel engaged in any aspect of telemarketing on the existence and use of the do-not-call list, identifying the name of the caller during each call, the name of the person or entity on whose behalf the call was made, and associated phone or address information, and actually honoring do-not-call requests within a reasonable time from the date such request is made. *Id.*

20.     The TCPA also prohibits initiating any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an artificial or prerecorded voice, to a cellular telephone number or residential line. 47 C.F.R. § 64.1200(a)(2)-(3).

21.     Further, a person or entity can be liable for calls made on its behalf in violation of

4

the TCPA, even if that person or entity did not directly dial such calls. *See, e.g., In re Rules &
Regs. Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995) (explaining that the
FCC's "rules generally establish that the party on whose behalf a solicitation is made bears
ultimate responsibility for any [TCPA] violations"). In fact, in May 2013, the FCC issued a
binding declaratory ruling clarifying that sellers "may be held vicariously liable under federal
common law principles of agency for TCPA violations committed by third-party telemarketers ...
under a broad range of agency principles, including not only formal agency, but also principles
of apparent authority and ratification." *In re Joint Petition Filed by DISH Network, LLC et. al for
Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6584 ¶ 28 (2013).

22.     Accordingly, an entity can be liable under the TCPA for a prohibited call made on
its behalf under a number of theories, including vicarious liability.  Under those circumstances,
including as described herein as to Allstate, the seller is properly deemed to have initiated the
call through the person or entity that actually placed it.

### Facts

### Plaintiff Hossfeld

23.     Allstate has failed to ensure that Hossfeld's do-not-call requests are honored,
which has led to him suing it previously for internal DNC violations under the TCPA—most
recently in *Hossfeld v. Allstate Ins. Co.*, No. 1:20-cv-07091 (N.D. Ill.) (the "20-7091 Action").

24.     After Hossfeld made a do-not-call request to Allstate in approximately mid-2020,
Allstate added Plaintiff's phone number to its internal do-not-call list on July 10, 2020.

25.     Hossfeld made other do-not-call requests in response to unsolicited Allstate
telemarketing calls he received, too, such as on November 12, 2020, November 13, 2020,
November 23, 2020, and November 24, 2020. Hossfeld also made do-not-call requests to

Allstate directly, such as in complaints he filed against it on December 1, 2020, February 1, 2021, and March 26, 2021.

26.     However, Allstate does not coordinate do-not-call requests amongst all those telemarketing on its behalf, and it does not ensure that they are properly scrubbing their call lists against it to avoid calling Hossfeld's and others' phone numbers.

27.     As a result, Hossfeld has continued to receive Allstate telemarketing calls despite his prior do-not-call requests and despite being on Allstate's internal DNC list.

28.     For example, starting in or around November 2020, an Allstate sub-vendor, Transfer Kings, began using its call center, Atlantic, to call Hossfeld's phone to encourage the purchase of Allstate insurance.

29.     Transfer Kings/Atlantic made twelve calls to Hossfeld's phone number to telemarket for Allstate insurance that were subject to Hossfeld's 20-7091 Action:

| Date/Approx. Time | Caller ID |
|---|---|
| November 11, 2020, at 4:27 p.m. | (281) 724-2161 |
| November 12, 2020, at 9:28 a.m. | (979) 764-0015 |
| November 12, 2020, at 10:51 a.m. | (512) 292-7410 |
| November 12, 2020, at 3:19 p.m. | (713) 928-6218 |
| November 12, 2020, at 5:56 p.m. | (254) 719-2300 |
| November 13, 2020, at 10:35 a.m. | (281) 334-6255 |
| November 13, 2020, at 11:22 a.m. | (817) 596-0033 |
| November 13, 2020, at 11:56 a.m. | (817) 596-0033 |
| November 20, 2020 | (325) 216-5148 |
| November 23, 2020, at 1:44 p.m. | (214) 765-9742 |
| November 24, 2020, at 2:40 p.m. | (214) 765-9742 |
| February 8, 2021, at 3:54 p.m. | (254) 749-2314 |

30.     On March 28, 2024, the Court in the 20-7091 Action granted summary judgment on liability and willfulness under the TCPA's internal DNC regulation, 47 C.F.R. § 64.1200(d), for Hossfeld as to the above twelve calls. *See* 20-7091 Action Dkt. 282.

31.     However, the scope of the 20-7091 Action did not extend to other calls Plaintiff

received by or on behalf of Allstate, and for which he now seeks redress through this action.

32.     For example, on April 7, 2021, at approximately 10:56 a.m., Transfer Kings/Atlantic called Hossfeld's telephone number from caller ID (254) 741-9102.

33.     When Plaintiff Hossfeld answered, the representative on the other end of the line—who identified himself as "Frank"—indicated that he was calling on behalf of Allstate, and proceeded to solicit Plaintiff for a quote for Allstate insurance.

34.     After Hossfeld answered a series of questions, "Frank" then transferred the call to an insurance agent who identified himself as "Alfonso Perez," and who informed Plaintiff that he writes insurance "with Allstate." Mr. Perez was an agent with an Allstate insurance agency owned by Daniel Gilmond.

35.     Mr. Perez then proceeded to try to sell Hossfeld Allstate insurance.

36.     During the call, Mr. Perez requested that Allstate process and email Hossfeld a quote for Allstate insurance. Allstate obliged, and issued Hossfeld the quote for insurance attached as Exhibit A, under the fake name used during the call.

37.     At the end of the call on April 7, 2021, Plaintiff Hossfeld told Mr. Perez that he kept getting calls despite repeated requests to stop, and asked that the calling cease.

38.     As another example, on September 3, 2021, Hossfeld received a call from caller ID (330) 894-5403.

39.     When Hossfeld answered, the person on the other end identified himself as "Jason White with Allstate," and proceeded to try to sell Hossfeld Allstate insurance.

40.     The call on September 3, 2021, disconnected after Mr. White asked Plaintiff Hossfeld several basic questions aimed at providing him a quote.

41.     As another example, Hossfeld received another telephone call on September 22, 2021, from caller ID (281) 997-5757.

42.     After Hossfeld answered, the person on the other end of the line again stated that they were with "Allstate," and proceeded to try to sell Allstate insurance to Plaintiff.

43.     After Hossfeld answered a similar set of basic questions, he was transferred to Richard Guerra of the Justin Powell Allstate agency, who similarly proceeded to try to sell Plaintiff Allstate insurance.

44.     During the call, Mr. Guerra requested that Allstate process and email Plaintiff a quote for Allstate insurance. Allstate obliged, and issued Hossfeld the quote for insurance attached as Exhibit B.

45.     As another example, on January 11, 2023, at approximately 10:09 a.m., Hossfeld received a call from caller ID (254) 728-3190.

46.     When Hossfeld answered, the representative proceeded to try to sell insurance to Plaintiff.  When Hossfeld asked who they were calling for, the representative indicated that the call was for "Michael"—which is the same name used in several of the calls at issue in the 20-7091 Action that Hossfeld received. Thus, on information and belief, this call was made for the purposes of encouraging the purchase of Allstate insurance.

47.     As another example, on January 20, 2023, at approximately 9:33 a.m., Hossfeld received a call from caller ID (254) 743-3921.

48.     When Hossfeld answered, the representative asked for "Michael Bradley," which is the same name used in several of the calls at issue in the 20-7091 Action that Plaintiff received.

49.     The representative said he was with "USAutoCare.com", and indicated that the

8

was calling to sell insurance for Allstate, among others.

50.     On information and belief, "USAutoCare.com" was a fake name provided to mask the true source of the calling.

51.     When the representative said he would call Hossfeld back after unsuccessful attempts to transfer Plaintiff to an insurance agent, Plaintiff told him to not call back. The representative then abruptly hung up.

52.     The above calls were all made for the purpose of encouraging the purchase of Allstate insurance.

53.     Hossfeld has received more calls than the ones delineated here that were initiated for the purpose of encouraging the purchase of Allstate goods, products, or services, which he expects to identify in discovery.

54.     Hossfeld did not provide prior express invitation or permission or consent for these calls. To the contrary, he has repeatedly asked not to receive calls by or on behalf of Allstate.

**Plaintiff Newman**

55.     After Newman made prior do-not-call requests to Allstate, including in approximately August 2021, Allstate added Plaintiff's phone number to its internal do-not-call list no later than August 30, 2021.

56.     However, Allstate does not coordinate do-not-call requests amongst all those telemarketing on its behalf, and it does not ensure that they are properly scrubbing their call lists against it to avoid calling Newman's and others' phone numbers.

57.     As a result, Newman has continued to receive Allstate telemarketing calls despite his prior do-not-call requests.

58.     For example, on February 2, 2022, at approximately 11:10 a.m., Newman received a call from caller ID (239) 667-6621.

59.     When Newman answered, the representative on the other end of the line introduced himself as "Mark with Allstate," who proceeded to try to sell Newman auto insurance.

60.     "Mark" confirmed during the call that he was calling on behalf of Allstate; however, the call terminated without Newman being transferred to an agent.

61.     As another example, on February 10, 2022, at approximately 11:43 a.m., Newman received a call from caller ID (863) 722-3514.

62.     When Newman answered, a representative on the other end of the line introduced herself as "Amy with Allstate," who proceeded to solicit Newman auto insurance following a similar script to the one used by "Mark" the week prior. This was because both calls were made by the same caller.

63.     After Newman answered some questions, "Amy" transferred Newman to someone who said they were a "senior supervisor" named "Jeff" who subsequently transferred Newman to Tiffani Finley of the Robert Wilson Allstate agency. Ms. Finley similarly proceeded to try to sell Newman Allstate insurance.

64.     Durin the call, Ms. Finley requested that Allstate process and email Newman a quote for Allstate insurance. Allstate obliged, and issued Newman the quote for insurance attached as Exhibit C.

65.     Shortly thereafter on February 10, 2022, Newman emailed Mr. Wilson, Ms. Finley, and Allstate directly to put them on notice that the continued calling was illegal and made despite a prior do-not-call request.

10

66.     Despite this, on March 21, 2022, at approximately 12:25 p.m., Newman received a call from caller ID (972) 424-6175.

67.     When Paintiff Newman answered, he was connected with an individual who introduced herself as "Shelley" with Robert Wilson's Allstate agency, who said she was following up to see if it was a better time for Plaintiff to sign up with Allstate now.

68.     Plaintiff notified Shelley about his prior do-not-call requests and desire to not receive calls telemarketing for Allstate.

69.     Shelley confirmed that other consumers had complained about similar unsolicited telemarketing calls.

70.     As another example of the unsolicited Allstate calls to Plaintiff's number, on June 15, 2023, at approximately 4:46 p.m., Newman received a call from caller ID (305) 203-5471.

71.     When Newman answered, he was connected to an individual who identified herself as "Sam from Free Insurance Quotes," who tried to sell Newman auto insurance. However, the call terminated after "Sam" was unable to transfer Newman to an agent.

72.     The following day, June 16, 2023, at approximately 8:39 a.m., Newman received a call from the same caller ID, (305) 203-5471.

73.     When Plaintiff Newman answered, he was connected to an individual who identified himself as "Danny with Free Insurance Quotes," who again tried to sell Newman auto insurance. "Danny" confirmed he was with the same company that called Plaintiff the day prior; however, he abruptly terminated the call after being unable to transfer Newman to an agent.

74.     On information and belief, "Free Insurance Quotes" is a fake name provided to mask the true source of the calling.

75.     Later that afternoon, June 16, 2023, at approximately 2:57 p.m., Newman received a call from caller ID (678) 904-1770.

76.     When Newman answered, he was connected to a representative who said she was with "Free Insurance Quotes," who proceeded to try to transfer Newman to an agent for purposes of soliciting insurance.

77.     Upon being transferred, Newman heard a prerecorded prompt say, "Great! I'll connect you to an agent!", before connecting him to a prerecorded phone tree that asked him to press "1" if he was insured by Allstate or "2" if he was not.

78.     After Newman pressed "2", he heard a message say he was being transferred to Direct insurance (i.e., Direct Auto Insurance), which is a member of the Allstate group of companies. However, after Newman followed the prerecorded prompt to submit his ZIP code, the call thereafter abruptly disconnected.

79.      Direct Auto Insurance publicly identifies itself as an Allstate company on its website, https://www.directauto.com. Thus, this call was made for the purpose of encouraging the purchase of Allstate products, goods, or services.

80.     Newman thereafter called the (678) 904-1770 number back, and heard a voicemail prompt that listed (209) 441-4939 as its associated phone number.

81.     When Newman thereafter called this (209) 441-4939 number, he was connected to a prerecorded prompt that identified the telemarketer as Frogger Auto, which then transferred Newman to the same, prerecorded "Great! I'll connect you to an agent!" prompt he heard previously.

82.     This time, Newman pressed "1" to indicate that he was already an Allstate customer, and a prerecorded message said that he would be connected to Answer Financial,

12

which is a member of the Allstate group of companies. Thus, these calls were designed to route call recipients to Allstate for the purpose of purchasing its products or services, regardless of how they answered the prompt.

83.     Answer Financial publicly identifies itself as an Allstate company on its website, https://www.answerfinancial.com/aboutus/carrierpartners/allstate.

84.     Later that same day, June 16, 2023, at approximately 3:04 p.m., Newman received another call from the same caller ID, (678) 904-1770.

85.     When Newman answered, he was connected to a representative who said she was with "Free Insurance Quotes," who proceeded to transfer Newman to the same "Great! I'll connect you to an agent!" prompt as in the calls earlier that day.

86.     This time, Plaintiff pressed "1", and heard the same prerecorded message that played before. However, the call thereafter disconnected.

87.     On information and belief, the reason Plaintiff was dropped from the transfers was because his phone number was on Allstate's internal DNC list, and Allstate or its agents scrubbed his phone number at the transfer rather than ensuring that it was scrubbed before the call, itself.

88.     Given the similarities between the calls Plaintiff received on June 15, 2023, and June 16, 2023, they were all made by the same caller.

89.     Newman notified Allstate directly about these unwanted calls, including via an email to its customer service email address and attorneys Frank Lukes and Mark Saltzman on June 16, 2023. Plaintiff again asked not to be called.

90.     On June 19, 2023, at approximately 12:24 p.m., Newman received a call from caller ID (940) 253-5078.

91.    Upon Newman answering, a prerecorded message played, which indicated that the call came from "U.S. Autocare." That this was a prerecorded message, as opposed to a live person, was obvious to Plaintiff given the intonation and unnatural nature of the communication. However, the call soon disconnected before Plaintiff could speak with a live person.

92.    Newman called the (940) 253-5078 number back, and was ultimately connected to an individual who identified themselves as "Jessie with Allstate."

93.    The June 19, 2023 call Newman received was made for the purpose of encouraging the purchase of Allstate goods and services.

94.    After receiving this call on June 19, 2023, Newman again reached out to Allstate via email to notify it of the continued unwanted calling.

95.    All of the above calls were made for the purpose of encouraging the purchase of Allstate insurance.

96.    Newman has received more calls than the ones delineated here that were initiated for the purpose of encouraging the purchase of Allstate goods, products, or services, which he expects to identify in discovery, including which used an artificial or prerecorded voice.

97.    Newman did not provide prior express invitation or permission or consent for these calls. To the contrary, he has repeatedly asked not to receive calls by or on behalf of Allstate.

**Additional Allegations**

98.    It is difficult to determine from whom Allstate calls originated, or that Allstate insurance is being solicited, because in many (but not all) cases Allstate's telemarketers fail to (a) identify themselves, (b) identify the name of the person or entity on whose behalf the calls are being made, or (c) provide a telephone number or address at which the person or entity may be

contacted is material, as required under 47 C.F.R. § 64.1200(d)(4).

99.     Absent identifying information being provided in the beginning of calls, call recipients have little idea who is calling them, or why.

100.    This is particularly true where Allstate's telemarketers frequently spoof their caller IDs to appear to be local to the call recipient, in order to trick consumers into answering calls they would not otherwise answer.

101.    Allstate's telemarketers or marketing "lead generators" often intentionally refuse to say who they are, use fake names, and delay identifying what specific products or services they're selling until further into the call or after it is transferred to the "closer" sales agent, because they want to avoid accountability.

102.    Allstate's agents, or those otherwise making calls on its behalf, did not have written do-not-call policies or procedures at the time of the calls to Plaintiffs and the classes defined below. Alternatively, whatever written policies existed either failed to comply with the minimum requirements under the TCPA, 47 C.F.R. § 64.1200(d), or were never properly implemented—including as evidenced by the continued calls to Plaintiffs after they directly asked not to be contacted.

103.    During all relevant times, Allstate maintained the power and right of interim control over its agents' and caller's actions with respect to the telemarketing complained of herein.

104.    Allstate maintains the right to terminate the agent, for any reason whatsoever, and it also maintains the sole right to alter the terms of its relationship with such parties at whim.

105.    Allstate's agents—including those with whom Plaintiffs spoke as a result of the calling at issue—maintain exclusive written agent or agency agreements with Allstate, which

grant Allstate control over, for example, the minutiae of how business is and may be generated on its behalf, the geographic scope of such, use of Allstate's tradename, and compliance and marketing practices, including with respect to telemarketing (and the use and form of such, such as approval of scripts, do-not-call practices, and use of artificial- or prerecorded-voice calls), TCPA compliance, use of vendors, and the extent to which such vendors must comply with Allstate's telemarketing-related practices, policies, and procedures.

106.    Allstate's agreement with its authorized agents specifically directs that the agent will act as its "agent" for the purposes of soliciting, selling, and servicing Allstate insurance, and that the agent shall be required to demonstrate knowledge of applicable rules and regulations (including as to the TCPA) upon Allstate's request. Allstate also has the right to access its agents' physical locations and records to review and ensure contractual and regulatory compliance.

107.    Allstate also gave its agents and their vendors, including those to whom Plaintiffs spoke as a result of the calling at issue, access to its proprietary product and pricing information and approved the sale and quotation of its insurance products as a result of the calling at issue. The agents and their vendors that called Plaintiffs and other class members did not have their own inventory and were not resellers of any kind; they acted directly for Allstate.

108.    Plaintiffs and other class members reasonably believed that the caller that called them had Allstate's authority for the calls at issue, based on Allstate's own actions—including through directly permitting the use of its tradenames during such calls, providing compensation for business derived from such calls, providing agents with proprietary pricing and product information for use to help sell its products and services during calls with prospective customers, and by retaining revenue and providing the administrative functions provided for as part of the

plan the consumer purchased during such calling.

109.    Allstate knew that its agents or their vendors were telemarketing on its behalf regardless of consumer do-not-call requests, and without having instituted proper procedures to stop calls to consumers who ask not to be contacted, yet it did nothing – or next to nothing – to prevent or stop the calling at issue. Rather, instead of repudiating the calls and business derived therefrom, Allstate continued to "pass the buck" by deflecting complaints like Plaintiffs' and blaming its telemarketers for illegal calls, while at the same time continuing to knowingly enjoy the benefits of the marketing, including issuing quotes to call recipients and obtaining money through plans being purchased as a result.

110.    Allstate had been sued repeatedly for similar TCPA violations prior to the calls to Plaintiff here, including by Plaintiff Hossfeld, but Allstate continued to engage in the conduct complained of herein despite having been put on notice of the violations.

111.    Allstate's actions and omissions with regard to the telemarketing complained of herein justify a reasonable assumption that it consented to the telemarketing at issue.

112.    Allstate knowingly accepted benefits that originated through the nonconsensual telemarketing at issue. Allstate knowingly compensated its agents (and/or their telemarketing vendors) for such, Allstate accepted the advertising benefit in having its products and services solicited to Plaintiffs and other class members, and it further benefitted by retaining money paid by call recipients for the plans purchased as a result of the illegal calling at issue on an ongoing basis, thereby ratifying such.

113.    Alternatively, to the extent Allstate claims it lacked full knowledge about every aspect of the telemarketing-based lead generation performed on its behalf, it failed to investigate further despite knowledge that would have caused a reasonable person to do so.

17

114.    Allstate has long known that consumers are suffering TCPA violations as a result of its improper telemarketing and lead generation practices. *See, e.g., Abante Rooter & Plumbing, Inc. v. Allstate Ins. Co.*, No. 1:15-cv-09025 (N.D. Ill. filed Oct. 13, 2015) (Allstate paid $10.5 million to settle TCPA class action); *Hossfeld v. Allstate Ins. Co.*, No. 1:19-cv-03492 (N.D. Ill. filed May 24, 2019); *Landy v. Allstate Ins. Co.*, No. 1:19-cv-06830 (N.D. Ill. filed Oct. 15, 2019) (putative TCPA class action); 20-7091 Action.

115.    Allstate, itself, has also long publicly acknowledged the exposure it and its partners face as a result of these calls, but has persisted in engaging in this unlawful telemarketing, anyway.

116.    Allstate believes that it has no responsibility for telemarketing calls made by others on its behalf, to Plaintiffs.

117.    Allstate believes that it has no responsibility to American consumers for telemarketing calls made by others on its behalf.

118.    Allstate has the power to stop its insurance agents from making or engaging others to make noncompliant telephone calls to Plaintiffs and the classes, but refuses to do so.

119.    Allstate has been active in lobbying and regulatory efforts aimed at attempting to relax the TCPA's requirements, and/or reduce or eliminate liability for TCPA violations. For example, in 2003 Allstate submitted comments urging the FCC not to adopt any Do Not Call Registry at all, and instead rely upon the company specific Do Not Call lists, which in its view were sufficient to "accomplish the objective of protecting consumers without unduly burdening the teleservices industry." Allstate continues to enjoy the benefits of illegal telemarketing in spite of the fact that the FCC has refused to adopt its requests and suggestions.

120.    Allstate's violations were negligent. Alternatively, they were willful and knowing.

121.     Plaintiffs and the classes were damaged by the violations alleged herein. Their privacy was improperly invaded, the Allstate calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. The calls were annoying and a nuisance, and wasted the time of Plaintiff and the classes. *See, e.g., Mims*, 565 U.S. at 372 (discussing congressional findings of consumer "outrage" as to prerecorded calls).

## Class Action Allegations

122.     As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following classes and subclass:

IDNC Class: All persons in the United States (i) to whom more than one call was made for the purpose of encouraging the purchase of Allstate goods or services (including to find a marketing "lead" for Allstate goods or services) in any 12-month period, (ii) to a residential telephone number, (iii) where the phone number was on the do-not-call list of Allstate or its agents or (sub)vendors at the time of at least one such call.

Subclass: All persons in the IDNC class whose calls they received arose from the same Allstate (sub)vendors that called Plaintiffs (e.g., Transfer Kings/Atlantic).

Robocall Class: All cellular subscribers and/or residential subscribers in the United States whose telephone number Allstate, or some third party on its behalf, called using an artificial or prerecorded voice, where prior to such call there existed no signed, written agreement with the recipient that included a disclosure informing the person signing that: (A) By executing the agreement, such person authorizes Allstate to deliver or cause to be delivered to the signatory telemarketing calls using an artificial or prerecorded voice; and (B) the person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

123.     Upon information and belief, including based on the volume of calls Plaintiffs themselves have received and the numerous other lawsuits Allstate has faced based on similar allegations of voluminous, illegal calling in violation of the TCPA, and Allstate's national presence, there are tens of thousands of persons in each class and subclass.

124.    Common questions of law or fact exist as to all members of the classes and

subclass, and predominate over any questions solely affecting any individual member, including

Plaintiffs. Such questions common to the classes include but are not limited to:

a.      Whether Allstate established and implemented, with due care, reasonable

practices and procedures to effectively prevent telemarketing in violation

of the TCPA's do-not-call regulations;

b.      Whether the calls to Plaintiff Newman and the Robocall Class were made

using an artificial or prerecorded voice as such terms are defined or

understood under the TCPA and applicable FCC regulations and orders;

c.      Whether Allstate had valid prior express written consent of the Robocall

Class, before they were called;

d.      Whether Allstate should be liable for any calls made by third parties; and

e.      Damages, including whether Allstate's violations were performed

willfully or knowingly such that Plaintiff and the other class members are

entitled to enhanced damages under 47 U.S.C. § 227(c)(5) and §

227(b)(3).

125.    Plaintiffs' claims are typical of the claims of the other members of the class and

subclass. The factual and legal bases of Defendant's liability to Plaintiffs and the other members

of each class and subclass are the same: For the IDNC Class and Subclass, Defendant violated

the TCPA by causing the residential number of each class and subclass member to be contacted

more than once for telemarketing purposes despite the number's appearance on Allstate's or its

agents' or downlines' internal do-not-call lists. For the Robocall Class, Allstate violated the

TCPA by causing artificial- or prerecorded-voice telemarketing calls to be made to the phone

number of each member of the class, without the requisite permission.

126.    Plaintiffs will fairly and adequately protect the interests of the class and subclass members. Plaintiffs have no interests that might conflict with the interests of the class and subclass members. Plaintiffs are interested in pursuing these claims vigorously, and have retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

127.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, thousands of members of the class and subclass, such that joinder of all members is impracticable.

128.    No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

129.    Allstate has acted and failed to act on grounds generally applicable to Plaintiffs and the other class and subclass members, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual class members, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.

130.    The identities of the classes and subclass are, on information and belief, readily identifiable from Defendant's and its agents' or (sub)vendors' records.

## COUNT I
## Violations of the TCPA, 47 U.S.C. § 227
## (Internal Do-Not-Call Violations)

131.    Plaintiffs re-allege and incorporate the foregoing allegations as if fully set forth

herein. Plaintiffs bring this count on behalf of themselves and the IDNC Class and Subclass.

132.    The TCPA requires any party that is engaged in telemarketing – including

"sellers" who do not make calls themselves – to maintain and honor a written internal do-not-call

policy.

133.    Allstate's written do-not-call policy and procedures are incorrect and insufficient

as to the TCPA's internal do-not-call rules.

134.    Allstate's policy and procedures improperly permit calls to phone numbers that

are on the internal DNC list, if the caller has "express written invitation or consent."

135.    Allstate's policy and procedures do not ensure proper coordination of internal

DNC requests among telemarketing or lead vendors or agents, and such coordination does not

take place.

136.    Allstate's policy and procedures do not ensure adequate or proper internal DNC

training.

137.    Allstate's policies and procedures do not ensure identification of the seller and

telemarketers during calls.

138.    Telemarketing calls made on behalf of Allstate are often spoofed, and fail to

properly identify Allstate or provide valid contact information.

139.    In addition to being a violation of 47 C.F.R. § 64.1200(d), it is a crime to spoof

telephone numbers on telemarketing calls, and violators are subject to both a "criminal fine," 47

U.S.C. § 227(e)(5)(B), and possible imprisonment. 47 U.S.C § 501. It is also a crime to

knowingly or willfully accept business derived from such.

140.     Allstate violated the TCPA by not having sufficient internal DNC policies and procedures and/or by not following or honoring those that it did have.

141.     Plaintiffs and the IDNC Class and Subclass members received more than one call in violation of these rules within a twelve-month period, and a cause of action under 47 U.S.C. § 227(c)(5) has therefore accrued.

142.     To the extent that some of the calls to Plaintiffs and the IDNC Class and Subclass were made by agents and/or vendors of Allstate, Allstate is liable for those calls, too.

143.     As a result of these violations, Plaintiffs and the IDNC Class and Subclass were damaged by Allstate's violations, in that they received non-privileged and unsolicited telemarketing calls that invaded their privacy, after having requested that calls stop. Pursuant to Section 227(c)(5) of the TCPA, Plaintiffs and the other members of the IDNC Class and Subclass are therefore each entitled to a minimum of up to $500 in damages for each violation; treble damages if violations are found to have been willful or knowing.

WHEREFORE, Plaintiffs Robert Hossfeld and Wes Newman, individually and on behalf of the IDNC Class and Subclass, respectfully requests that the Court enter judgment against Defendant Allstate Insurance Company for:

A.     Certification of the IDNC Class and Subclass as alleged herein;

B.     A declaration that Defendant violated the TCPA as to Plaintiff and the IDNC Class and Subclass;

C.     An injunction to prevent further violations;

D.     Damages pursuant to 47 U.S.C. § 227(c)(5), as applicable;

E.     Costs, expenses, and attorneys' fees, to the extent permitted by law; and

F.      Such other or further relief as the Court deems just and proper.

**COUNT II**
**Violations of the TCPA, 47 U.S.C. § 227**
**(Robocall Violations)**

144.    Plaintiff Newman re-alleges and incorporates the foregoing allegations as if fully set forth herein. Plaintiff Newman brings this count on behalf of himself and the Robocall Class.

145.    It is a violation of the TCPA to call a cellular or residential telephone number to include or introduce an advertisement or for telemarketing purposes, and play an artificial or prerecorded voice. 47 C.F.R. § 64.1200(a)(2)-(3).

146.    Allstate initiated or caused to be initiated calls using an artificial or prerecorded voice to the cellular and residential telephone numbers of Plaintiff and the other members of the Robocall Class defined above for telemarketing purposes, i.e., to encourage the purchase of Allstate insurance.

147.    These calls were made even though Allstate did not have prior express written consent from subscribers who received such calls—as in the case of Newman.

148.    To the extent that some of the calls to Plaintiff and the Robocall Class were made by agents and/or vendors of Allstate, Allstate is liable for those calls, too.

149.    As a result of Allstate's conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the other members of the Robocall Class were harmed and are each entitled to a minimum of $500 in damages for each violation; treble damages if violations are found to have been willful or knowing.

WHEREFORE, Plaintiff Wes Newman, individually and on behalf of the Robocall Class, respectfully requests that the Court enter judgment against Defendant Allstate Insurance Company for:

A.     Certification of the Robocall Class as alleged herein;

B.     A declaration that Defendant violated the TCPA as to Plaintiff and the Robocall
       Class;

C.     An injunction to prevent further violations;

D.     Damages pursuant to 47 U.S.C. § 227(b)(3), as applicable;

E.     Costs, expenses, and attorneys' fees, to the extent permitted by law; and

F.     Such other or further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs request a jury trial as to all claims of the complaint so triable.

Respectfully submitted,

Dated: April 1, 2024

ROBERT HOSSFELD and WES
NEWMAN, individually and on behalf of
others similarly situated

By: _/s/ Alexander H. Burke_

Alexander H. Burke
Email: aburke@burkelawllc.com
Daniel J. Marovitch
Email: dmarovitch@burkelawllc.com
BURKE LAW OFFICES, LLC
909 Davis Street, Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288

*Counsel for Plaintiffs*

## **Document Preservation Demand and Do Not Call Request**

Plaintiffs hereby demand that Defendant take affirmative steps to preserve all recordings, data, databases, call records, evidence relating to consent or prior express invitation or permission for calls, e-mails, recordings, documents, and all other tangible things that relate to the allegations herein, Plaintiffs, or the putative class members, or the making of telephone calls, the events described herein, any third party associated with any telephone call, campaign, account, sale, or file associated with Plaintiffs or the putative class members, and any account or number or symbol relating to any of them. These materials are very likely relevant to the litigation of this claim. If the Defendant is aware of any agent, vendor, subvendor or other third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant or counsel obtain and preserve all such materials, and identify such so that Plaintiffs may take appropriate steps to ensure preservation of the materials, too. This demand shall not narrow the scope of any independent document preservation duties of any Defendant.

Plaintiffs also request that Defendant and its agents and (sub)vendors stop calling their telephone numbers, which have been previously provided to Allstate and/or its agents.

_/s/ Alexander H. Burke_